UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80893-CIV-LYNCH

SAMUEL S. MATTHEWS, JR.,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration,

    Defendant.
_____/



FILED by _____ D.C.

MAY 29 2007

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S D. OF FLA.

## ORDER OF SUMMARY JUDGMENT

**THIS CAUSE** comes before this Court upon the Plaintiff's Complaint. Having reviewed the pleadings[1] and the administrative record, and having held a hearing thereon on May 24, 2007, this Court finds as follows:

### BACKGROUND

1. The Plaintiff applied for disability insurance benefits under Title II of the Social Security Act in April 2002, his third such application. His application was denied initially and after reconsideration, and on July 1, 2005, following a hearing, an Administrative Law Judge ("ALJ") found the Plaintiff not disabled under the terms of the Act. The Appeals Council denied his Request for Review on September 5, 2006, thereby leaving the ALJ's

---

[1] Neither party submitted a diskette copy of their respective Proposed Findings of Fact and Conclusions of Law, as this Court's November 28th, 2006 Order had instructed.

decision as the Commissioner's final decision subject to judicial review.

   2.   The Plaintiff claims disability as the result of a neurocardiogenic syncope syndrome characterized by regular fainting or near-fainting spells. Although he claims these conditions first bothered him in November 1997, his first syncopal episode did not occur until March 1998. Thereafter the Plaintiff began to experience regular syncopal episodes, and it was this condition that forced him to wind down his medical practice and to cease employment activities. In his initial paperwork he also claims chronic recurrent pancreatitis related to gall bladder stones, pain, weight loss, anorexia, and vomiting.

   3.   At the time of the hearing, held March 1, 2005, the Plaintiff was 48 years old. Since finishing medical school in the late 1980's he had worked as a plastic surgeon. He has been receiving private disability insurance benefits during the intervening years.

   4.   The medical record begins in March 1998 when the Plaintiff passed out before beginning an operation. He was diagnosed with accelerated hypertension with a history of weakness and increased heart rate. Testing revealed normal heart functioning, and he was discharged with recommendations to stop smoking, to eat a healthy diet, and to exercise. He had two more full syncopal episodes at work that year. Testing ruled out an

adrenal problem, and a chest radiograph was also normal. Also during 1998 the Plaintiff was having domestic problems, and he was seeking psychological care with Dr. Taylor. Dr. Taylor noted a two to three year history of depression, obsessive-compulsive disorder, and anxiety. He diagnosed major depression, recurrent, obsessive-compulsive disorder, and panic attacks, and he noted further the possibility of a drinking problem and the use of alcohol to calm his anxiety. In light of this state of health, Dr. Von Hofe, a physician who undertook a special examination of the Plaintiff, diagnosed episodic hypertension with possible panic disorder superimposed. By December Dr. Taylor observed the Plaintiff's depression and hypertension to be easing.

    5.   In April 1999 Dr. Taylor wrote the Commissioner, stating the Plaintiff's diagnoses as recurrent depression and obsessive-compulsive disorder for which the Plaintiff takes Celexa. He stated further, "as far as his gait, ability to be awake and the necessity for Inventory H, I cannot comment on this", apparently declining to offer an opinion on residual functional capacity ("RFC"), at least in terms of physical exertion. A few months later a DDS non-examining medical advisor rendered an RFC regarding the Plaintiff's physical abilities, rating him able to do medium work subject to only occasional climbing and no hazards, based on an "unknown etiology". The Plaintiff had his first DDS consultative psychological examination

with Dr. Moss in July 2001. The Plaintiff reported normal daily life activities. Dr. Moss offered no diagnosis although he did indicate obsessive-compulsive personality traits. Based on this assessment, a non-examining DDS medical advisor found the Plaintiff to have non-severe affective, anxiety, and personality disorders.

6.  With the cause of the Plaintiff's syncopal episodes unclear and blood pressure medication actually making the condition worse, the Plaintiff went to the Autonomic Dysfunction Center at Vanderbilt University in May 1999 for further study. The doctors there tested him over the course of several days and announced the results in a special report. The lead doctor concluded that a "central SNS activation" was the most likely cause of the Plaintiff's increased blood pressure, heart rate, and "plasma and urinary catecholamines." The doctor further postulated "alcohol abuse/dependence [to be] a likely cause or at least a contributor to his episodes and symptoms." In other words, the doctor anticipated that "his episodes will largely resolve with complete abstinence from alcohol." For this reason the Center tried very hard to make accommodations for him to see its Addiction Medicine department, but the Plaintiff declined every attempt.

7.  In July 1999 Dr. San gave a sworn deposition interview regarding the state of the Plaintiff's health, apparently

supplemental to a previous statement not contained in the record. Therein Dr. San explained how neurocardiogenic syncopes result from a malfunction in the body's ability to regulate blood pressure whereby extreme lows bring about syncopal events followed by extreme highs of hypertension. Dr. San was cognizant of the Vanderbilt University report, and he conceded that alcohol theoretically could be an exacerbating factor. However, since the Plaintiff denied having a drinking problem, Dr. San opined that it played no role in his condition. When asked to assume the Plaintiff did have a drinking problem, Dr. San declined to opine whether alcohol either caused or worsened the Plaintiff's particular condition. Lastly Dr. San reaffirmed an earlier opinion that the Plaintiff is "totally disabled."

8.  The Commissioner scheduled more consultative examinations in 2000. Following a normal physical examination, Dr. Santa Maria found the Plaintiff to have "recurrent unexplained syncopal episodes, which if not directly attributable to alcohol abuse, certainly are not helped by ongoing drinking and cigarette smoking. The patient has no other clinically detectable etiology for this complaint." An advisor rated the Plaintiff as able to do medium work but no hazards. Dr. Reynolds, in performing a consultative psychological examination, found the Plaintiff to have an anxiety disorder, not otherwise specified, with panic elements and possible history of alcohol abuse. The doctor found

that while the Plaintiff's anxiety has not caused his medical condition, it is a likely exacerbating factor. She did not regard the anxiety as posing any work-related limitations apart from the syncopal condition, though. An advisor translated this into a finding of non-severe anxiety-related disorder and insufficient evidence of alcohol abuse.

9. In 2000 the Plaintiff began a treating relationship with Dr. Kateb, an internist and pulmonary specialist, whose first diagnoses were of syncopal autonomic dysfunction, tachycardia, and hypertension. Soon afterwards the Plaintiff became jaundiced, and he received treatment for that condition. A CT scan showed his liver to have diffuse fatty infiltrates without focal abnormality and indication of prior, chronic pancreatitis. The doctor was unable to perform a cirrhosis biopsy due to financial limitations. The Plaintiff also saw Dr. Hirth, gastroenterologist, for his liver problems who saw no viral hepatitis but did diagnose progressive jaundice possibly secondary to alcohol hepatitis/ liver disease. He strongly recommended hospitalization. Soon thereafter the Plaintiff's liver functions stabilized and improved.

10. The Plaintiff's period of Social Security insurance coverage ended on December 31, 2000, but the Plaintiff's syncopal condition remained. In January 2001 the Plaintiff's private insurer memorialized a conversation with Dr. Kateb. The record

contains only the first page of the letter, but therein it appears that Dr. Kateb had suggested the possibility of sedentary work for the Plaintiff. In subsequent insurance reports, however, Dr. Kateb stated that the Plaintiff's frequent syncopal episodes posed a severe restriction to working and precluded walking, sitting, or driving. Dr. Kateb explained further that prior trials of different medications and treatments had failed to provide relief, and he gave a poor prognosis for the future.

11.  The Plaintiff began having liver and pancreas problems again in March 2002, eventually leading up to a trip to the emergency room with abdominal pain, following which his gallbladder was removed. Dr. Sider wrote a letter explaining that despite the corrective measures the Plaintiff will continue to have lifelong pancreatitis pain.

12.  Two additional RFC reports were prepared with one advisor rating the Plaintiff able to perform a full range of medium work and the other rating him able to perform medium work except for climbing ladders, etc., or hazards.

13.  Through the rest of 2003 and for the remainder of the medical record, the Plaintiff continued to see Dr. Kateb. In late 2003 the Plaintiff's alcohol use worsened, and Dr. Kateb tried relieving the Plaintiff's anxiety with Paxil. He also placed the Plaintiff on Klonopin to help ease the syncopes. In December 2004 the Plaintiff was Baker Act'ed after attempting suicide. In

January 2005 he went to the emergency room after experiencing his first round of syncopes absent the usual forewarning prodromes.

14.  In February 2005 Dr. Kateb, who by that time had treated the Plaintiff for four to five years, gave a sworn deposition interview explaining the state of the Plaintiff's health. Dr. Kateb explained that the Plaintiff had neurocardiogenic syncopes of a frequency ranging between a few a day to once in a couple of weeks. These individual syncopal episodes are of a few minutes to 15-20 minutes in duration. Dr. Kateb has observed no symptom exaggeration and regarded alcohol as a non-contributory factor. In other words the frequency of the Plaintiff's syncopes did not change with alcohol consumption. In terms of work-related functioning, Dr. Kateb stated that as of August 2000 (the start of the treating relationship) the Plaintiff has been unable to do even sedentary work. The Plaintiff needs frequent, unhindered rest breaks to deal with his syncopes, and he has the potential for multiple episodes in one day.

15.  The Plaintiff testified at the hearing, explaining that he has syncopes of between 4-5 to 10 a week in frequency, sometimes with multiples clustering in one day. He stated that for each one he has a prodrome, or a sense of an oncoming syncope, during which time he must lie down to avoid passing out. He then requires several hours' rest before rising again. He also claimed his ongoing irritable bowel syndrome contributed to the problem.

He takes Klonopin, but medication generally only lessens the episodes. He runs his household, cares for his teenage son, and engages in the sedentary activities of playing the guitar, using the computer, watching TV, reading, and playing with his dogs. He does drive. And he has made various lifestyle changes, such as avoiding stress, heat, and physical exertion that tend to precipitate syncopes, and making accommodations to rest immediately following a prodrome. He denied having a problem with alcohol.

16. Also testifying at the hearing was a vocational expert ("VE"). The ALJ propounded various hypotheticals, and the VE opined that the Plaintiff could perform various medical office jobs at the sedentary exertional level but could perform no work if his syncope allegations were true.

17. The ALJ found the Plaintiff to have the "severe" impairments of hypertension with syncopal episodes, alcohol abuse/dependence, and alcoholic hepatitis. The ALJ did not find the Plaintiff to have any "severe" psychological impairment. The ALJ noted the observations of Dr. Taylor, an early treating psychologist, and Drs. Moss and Reynolds, two consultative pyschologists, who suggested either that the Plaintiff had no diagnosable condition or that his anxiety – when judged alone – posed no significant work-related restrictions.

18. The ALJ turned to the question of how much the

Plaintiff's condition reduced his RFC. In doing so, the ALJ limited his review mostly to the medical record before December 31, 2000, the Plaintiff's date last insured. The ALJ recounted the Plaintiff's syncopal episodes at work as well as the contributory role of alcohol in both the syncopal condition, itself, and the liver problems. He then rejected the disability opinion of Dr. San, a treating physician, on the grounds that (1) it is a legal question reserved to the Commissioner to decide and (2) Dr. San was ambiguous as to whether he meant total disability or just an inability to work as a surgeon. The only item of post-coverage evidence the ALJ did mention was Dr. Kateb's February 2005 disability opinion. The ALJ did not directly address Dr. Kateb's statements or expressly articulate good cause for rejecting them. Instead the ALJ seemed to minimize Dr. Kateb's opinion indirectly by finding the issue of alcohol use to be irrelevant.

19. The ALJ next judged the Plaintiff's credibility. He rejected the Plaintiff's allegations of total disability on the grounds that (1) his daily life activities (driving, housekeeping, computer use, guitar playing) are inconsistent with the inability to perform sedentary work and (2) his $65,000 a year private disability benefits present "poor motivation to return to work". The ALJ also stated in a conclusory fashion that the Plaintiff's contentions "were not supported by clinical or laboratory findings establishing impairments which reasonably could be expected to

cause such limitations, they were inconsistent with other evidence, and the overall evidence did not persuasively establish excess pain or greater limitations." This statement is curious because the Plaintiff raised no substantive pain allegations.

20. Pursuant to the above analysis the ALJ assessed an RFC for sedentary work subject to avoiding hazards such as moving machinery and unprotected heights. (The ALJ did not account for any non-exertional impairment such as from the Plaintiff's fainting spells.) The Plaintiff's RFC precluded his return to his prior work as a surgeon, classified at the light exertional level. The ALJ therefore proceeded to determine the availability of other, more amenable employment. The ALJ noted that the VE testified a person of the Plaintiff's vocational profile and RFC could perform the jobs of office manager, admitting clerk, or receptionist in a medical setting. This finding was consistent with the Medical-Vocational Guidelines which directed a finding of not disabled under the same criteria. The ALJ followed suit and concluded that the Plaintiff was not disabled.

## **DISCUSSION**

Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to

more than a scintilla; in other words, it is such relevant evidence that a reasonable person might accept as sufficient and adequate to support the conclusion reached. See id. at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court re-weigh the evidence nor substitute its judgment for that of the ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).

The ALJ's decision contains numerous errors which together call its reliability into question. The Plaintiff draws this Court's attention to three particular errors which this Court will address first. The Plaintiff objects to the ALJ's rejection of his treating physicians' disability opinions, and he states a persuasive argument. It is true that while treating source opinion is not necessarily determinative of the legal question of disability, see 20 C.F.R. § 404.1527(e) and SSR 96-5p, the ALJ still must give substantial weight to such evidence, see 20 C.F.R. § 404.1527(d)(2) and Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988). Therefore, before rejecting treating source opinion, the ALJ must articulate good cause for doing so. See Lewis, 125 F.3d at 1440. Here the ALJ failed to state good cause for discounting the opinions of Drs. San and Kateb in accordance with these requirements. With respect to Dr. San, the ALJ stated only that

his disability opinion was ambiguous, despite the fact that Dr. San seems quite clear in meaning total disability. If there were ambiguity, the ALJ did not contact him for a clarification. The ALJ offered no meaningful discussion regarding Dr. Kateb's detailed opinion.

The ALJ also gave short shrift to his consideration of the Plaintiff's subjective complaints. Indeed it appears that the ALJ lacked a correct understanding of the nature of the Plaintiff's situation. Moreover the ALJ offered only two reasons for discounting the Plaintiff's credibility — his engagement in sedentary activities at home and his receipt of generous private disability benefits — neither of which are compelling by themselves. See, e.g., Bennett v. Barnhart, 288 F.Supp.2d 1246, 1252 (N.D. Ala. 2003) and Sellers v. Barnhart, 246 F.Supp.2d 1201, 1213 (M.D. Ala. 2002) (explaining that basic housework and familial care activities alone do not necessarily prove a claimant's ability to engage in substantial gainful activity). More importantly, however, the ALJ ignored the context of the Plaintiff's activities and the accommodations he made to better handle his fainting spells. The ALJ simply left the credibility of the Plaintiff's fainting spells unaddressed.

This failure to account for the true nature of the Plaintiff's impairment likewise negatively affected the ALJ's RFC assessment. The ALJ assessed the Plaintiff able to do sedentary

work, thereby emphasizing exertional demands over non-exertional demands, despite the primarily non-exertional nature of the Plaintiff's recurrent syncopes. The ALJ's approach is made more curious since he precluded the Plaintiff from climbing and hazards activities due to these very syncopal episodes. In other words, by treating the Plaintiff's claim as a physical impairment, the ALJ reached an illogical result. But even taking the ALJ's RFC on its own merits, it is flawed since it is unclear what medical evidence supports the assessment.

This Court notes additional ancillary problems with the ALJ's analysis that further weaken the decision's reliability. To begin with it seems the ALJ improperly accounted for the Plaintiff's anxiety at Step Two of the SSA analysis. At this stage in the analysis the ALJ must ascertain whether a claimant's impairment is both medically determinable and significant enough to interfere with his or her ability to work. See SSR 85-28, McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986), and Sellers, 246 F.Supp.2d at 1211. The instant record contains significant evidence of an anxiety-related problem, one possibly exacerbating the Plaintiff's alcohol abuse and syncopes, sufficient enough to meet Step Two's threshold requirements. The ALJ's analysis on the matter may be better suited for determining how it lessens the Plaintiff's RFC, at Step 4 of the SSA analysis. The ALJ likewise may need to properly account for the role of alcohol.

Lastly the ALJ offered no discussion regarding the proper scope of the applicable medical record. The ALJ did not discuss any collateral estoppel effect of the Plaintiff's two prior disability applications, an issue which this Court considers now to be waived. Nor did the ALJ discuss the role of the medical record post-dating the Plaintiff's date last insured of December 31, 2000. The ALJ focused the bulk of his recitation to the prior medical record, but then he discussed Dr. Kateb's February 2005 deposition, without mentioning the remainder of the later medical record. On remand, the ALJ shall consider the full scope of the medical record, including any new evidence. Generally speaking, a claimant's date last insured represents a cut-off to the governing time period, see Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997), but medical evidence which relates back to the governing time period may be considered if relevant to establishing the onset date of disability, see Benjamin v. Apfel, 2000 WL 1375287 (S.D. Ala. 2000) (reviewing the full scope of the medical record, even those portions post-dating the claimant's date last insured). See generally, SSR 83-20.

## CONCLUSION

Reversal of the ALJ's decision is warranted in short due to the ALJ's failure to follow the governing legal standards and to support his findings with competent, substantial evidence. In a more practical sense the ALJ, by misconstruing the nature of the

Plaintiff's condition and its impact on his RFC, ignored the dispositive question of whether the Plaintiff can still work despite his syncopes. Some of the ALJ's errors — improperly discounting treating physician opinion and subjective testimony — generally warrant remand for an award of benefits, see MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986) and Wilson, 284 F.3d at 1225, respectfully (accepting such evidence as true as a matter of law). In the instant situation, however, where the ALJ made several errors, misconstrued the nature of the Plaintiff's impairment and subjective testimony, etc., this Court finds a remand for a complete reconsideration to be more appropriate. See Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996). See also, Morrison v. Barnhart, 278 F.Supp.2d 1331 (M.D. Fla. 2003) (remanding a case for further explanation when the ALJ's consideration of treating source opinion was too general). Upon reconsideration the ALJ shall be sure to address the key points and further develop his analysis of the Vanderbilt University report, the Plaintiff's alcohol use and its role, if any, and the non-exertional nature of the Plaintiff's impairment. The ALJ shall also address whether some amenable work is available that the Plaintiff still can perform, especially in light of his retained functional abilities and continued driving.

Based on the foregoing, it is hereby,

**ORDERED AND ADJUDGED** that summary judgment is **GRANTED** in the

Plaintiff's favor and that the Commissioner's decision is **REVERSED** and **REMANDED** for reconsideration in accordance with the above instructions. The Commissioner shall hold the necessary proceedings as soon as practical.

   **DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 25th day of May, 2007.

                                      _____
                                      FRANK J. LYNCH, JR.
                                      UNITED STATES MAGISTRATE JUDGE

cc: Lyle D. Lieberman, Esq.
    Jeffrey W. Dickstein, AUSA